[No. 33612. Department One. September 13, 1956.]

JOSEPH JOHN FLEISCHMAN *et al., Respondents,* v. M. A. HOCKETT *et al., Appellants.*

M. A. HOCKETT *et al., Appellants,* v. JOSEPH JOHN FLEISCHMAN *et al., Respondents.*[1]

*Raftis & Raftis,* for appellants.

*Thomas F. Lynch* and *Richard A. Perry,* for respondents.

[1]Reported in 301 P. (2d) 166.

DONWORTH, C. J.—This is an appeal from a judgment and decree entered as a result of the trial of two consolidated actions arising out of a sale of farm property and an agreement by defendants to assign certain Indian allotment leases to plaintiffs.

Plaintiffs instituted an action for damages (hereinafter called the fraud action) based upon alleged fraudulent representations by defendants. In their first cause of action in their third amended complaint, plaintiffs sought recovery of $125 for the alleged failure of defendants to assign certain Indian allotment leases totaling some 143 acres. In their second cause of action, plaintiffs sought recovery of $17,820 for an alleged deficiency in the number of tillable acres of farm land actually conveyed. Defendants' answer admitted the agreements to assign the leases and to convey the real property described in the complaint and put all other material matters in issue by appropriate denials. By way of affirmative defense, defendants alleged (1) that plaintiffs were experienced farmers, made their own investigation, and that defendants did not conceal any information from plaintiffs; and (2) that plaintiffs were guilty of laches.

Subsequently, defendants commenced an action (hereinafter called the foreclosure action) to foreclose a purchase-money mortgage, in the amount of ten thousand dollars, executed and delivered by plaintiffs to defendants for the balance of the purchase price of the land in question. Plaintiffs' answer in this foreclosure action admitted the execution of the promissory note and the mortgage, and placed all other material matters in issue by appropriate denials. By way of affirmative defense and cross-complaint, plaintiffs alleged the same matters as were contained in their third amended complaint in the fraud action, and in the prayer of their answer asked for cancellation of the note and mortgage and for judgment against defendants in the sum of $7,820 (the difference between the judgment sought in the fraud action and the judgment sought in the mortgage foreclosure action).

These consolidated actions were tried before the court

sitting without a jury. After the conclusion of the trial, the court rendered its memorandum decision stating, in part, that fraud had been proven by clear, cogent, and convincing evidence as to the second cause of action (the fraud action), but held that there had been a failure of proof as to the first cause of action (the alleged failure to assign the Indian allotment leases). The court held that the plaintiffs' damages were ten thousand dollars, and that plaintiffs were entitled to a decree dismissing the complaint in the foreclosure action and canceling the note and mortgage.

Thereafter, defendants' alternative motions for reconsideration or for a new trial were denied, and findings of fact, conclusions of law, and a judgment and decree were entered. From this judgment and decree, defendants have appealed.

For convenience, we shall refer to M. A. Hockett by name or as appellant, and to the Fleischmans by name or as respondents.

Briefly stated, the situation of the parties at the time of the negotiations preceding the sale and the actual consummation of the conveyance of the land was substantially as follows:

Appellant owned and operated a cattle ranch and farm consisting of 4,030 acres of mountainous land near Curlew, Washington. On March 26, 1952, appellant listed his ranch with a real-estate firm in Omak.

About April 1, 1952, respondents drove to the Hockett ranch and viewed a part of the premises. The next day they again returned to the ranch at about ten a. m. and spent the day viewing and inspecting the premises. On April 11, 1952, respondents again viewed certain portions of the Hockett ranch, and later that day executed the sale agreement, note, and mortgage. The transaction was not finally consummated until April 24, 1952, by which time all parties had signed the various instruments. On that date, the deed was delivered from escrow to respondents, and the cash payment of thirty thousand dollars was made by respondents and the note and mortgage were delivered to appellant.

It should be noted at this point that we are herein concerned only with the number of acres of plowland conveyed which was represented as ready for sprinklers, and *not* with the range or pasture land. Of the 4,030 acres of land on the ranch, respondents purchased and received a conveyance of only 3,367 acres. The plowland was situated on a part of the 3,367 acre tract and consisted of (1) a lower field lying along a slope at the base of a mountain (which was the field represented as ready for sprinklers), and (2) an upper field lying on a "bench" which was located across a gulch and to the west of the lower field. Respondents do not contend that the upper field was represented as capable of being placed under sprinklers.

Shortly after April 11, 1952, respondents took possession of the Hockett ranch and moved seventy-five head of cattle onto the range and pasture land. About April 30, 1952, the lower field was measured for the purpose of installing a sprinkler system. Respondents assisted Ray F. Carlson in measuring the lower field. He was the field man for the company which later installed the sprinkler system. Mr. Carlson informed respondents that the field contained less than eighty acres, which respondents refused to believe. A survey made in October, 1953, revealed that the total acreage in the lower field was actually 64.1 acres, and that the upper field contained 12.8 acres.

Respondents' testimony is that the lower field was represented to contain 158 acres and that the upper field was represented to contain 30 acres. They further testified that the lower field was irregular in shape and that the whole field could not be seen from one given point. However, respondents did drive over the lower field, stopped two or three times and examined the soil, had the boundaries pointed out to them, and spent over two hours on their second visit examining this 64.1 acre field.

Respondents stated that they could see the fences on the east, south, and west sides of the tract. They stated that on their tours of inspection of the premises they stopped on the north boundary and that a plow ridge, or furrow, clearly

marked the north boundary, which was pointed out by appellant. The land lying to the north of the 64.1 acre field was one of the Indian allotment leases which respondents received as a result of this transaction. Respondents testified that they did not see or examine the 12.1 acre field during their examination of the ranch.

This case can be disposed of by a consideration of the first four errors assigned: The first three relate to the making of findings 3, 4, and 5, and the fourth is that the findings of fact are insufficient to support the entry of judgment.

Finding of fact No. 3 reads, in part, as follows:

". . . that thereafter plaintiffs, Joseph John Fleischman and his wife and Ben F. Fleischman, first visited the Hockett ranch, and defendant, M. A. Hockett, informed them that his ranch had 158 acres of plowland ready for sprinklers. The following day Arthur L. Hockett told the same plaintiffs in M. A. Hockett's presence that his boy owned 158 acres of wonderful land. Plaintiffs believed these representations."

Finding of fact No. 4 reads as follows:

"That the Hockett ranch consisted of 4,030 acres of mountainous rolling land. It was impossible to see the whole ranch from any one place on it. That the cultivated portion of the Hockett ranch was in two separate fields, the larger of which contained 64.1 and the smaller one 12.8 acres. These fields were separated by uncultivated land and a deep gulch. The land represented as containing 158 acres of plowland was deceiving in appearance, and there was no fence or clearly defined line of demarcation between certain of the plowlands and the north Indian Allotment. M. A. Hockett represented that the so-called upper field contained 30 acres of plowland, but it actually contained 12.8 acres. Plaintiffs were under compulsion to get their cattle onto the Hockett ranch, and they did not question defendants' representations; that after the consummation of the transaction plaintiffs had the plowland measured for sprinklers; that plaintiffs refused to believe witness Carlson's estimate of plowland acreage a short time after his measurements were made; that plaintiffs learned the true acreage of plowland in the ranch after a survey by Bendixen;"

Finding of fact No. 5 reads, in part, as follows:

"That the number of acres of plowland ready for sprink-

lers that plaintiff received totaled 103.1 acres. That this was 54.9 acres less than they bargained for; . . ."

We want to make it clear that in deciding this case we are not considering the testimony of appellant and his witnesses, and, therefore, no question of evaluating conflicting testimony is involved.

After our review of the record, which contains more than five hundred pages of testimony and numerous exhibits, we have reached the conclusion that the above quoted findings are not supported by respondents' testimony in many material respects, as more specifically hereinafter pointed out. However, assuming that appellant and his father made the representations as stated in findings of fact Nos. 3 and 4, and accepting these findings (with the exception above referred to) as established facts of the case, the question presented for our determination is whether respondents had a right to rely upon these representations.

Finding of fact No. 5 is clearly inconsistent with finding No. 4, and also contrary to respondents' testimony, wherein it states "That the number of acres of plowland ready for sprinklers that plaintiff received totaled 103.1 acres." The total number of acres of plowland in that part of the Hockett ranch *conveyed by deed* to respondents was 64.1 acres (lower field) plus 12.8 acres (upper field), or a total of 76.9 acres. This fact is corroborated by the survey which was admitted in evidence and upon which respondents based their action in computing the alleged shortage of plowland conveyed.

The trial court added 39 acres to the 64.1 acre figure to reach this amount of 103.1 acres. This 39-acre figure represents small parcels of cultivated land, or land capable of cultivation, which were located on the two Indian allotment leases. The estimates of the amount of acreage in these parcels of land were elicited from appellant on cross-examination, and there were at least two parcels upon which appellant refused to venture an estimate as to acreage. As we add the figures in the record, it is also evident that the trial court did not include the 12.8 acre upper field in its com-

putation but did erroneously include parts of the two Indian allotments.

The Indian allotment leases were not a part of the land conveyed by deed, and respondents were informed of this fact by appellant when they made their investigations of the farm. The trial court dismissed their first cause of action based upon the alleged failure of appellant to assign these leases, finding that respondents received all that they were entitled to in relation thereto. Therefore, the 39-acre figure should not have been included in the court's computation. The correct total, as stated above, is 76.9 acres instead of 103.1 acres.

There is at least one statement in finding of fact No. 4 which is clearly contrary to respondents' testimony. That finding states that "there was no fence or clearly defined line of demarcation between certain of the plowlands and the north Indian Allotment." It is true that there was no fence on the north boundary of the 64.1 acre field. However, respondents testified that there was a plow furrow, or ridge, marking the boundary, and that appellant pointed it out to them, explaining that the land to the north was one of the Indian allotments. From this point, respondents looked south and viewed the larger portion of the 64.1 acre field.

In view of the conclusion we have reached with respect to appellants' fourth assignment of error, we do not consider it necessary to decide whether respondents have sustained the burden of proving the other elements of fraud, except the right to rely upon the misrepresentations, by testimony that is clear, cogent, and convincing, as required by the rule referred to in *Forsyth v. Davis*, 152 Wash. 595, 278 Pac. 676; *Marion v. Grand Coulee Dam Hotel*, 35 Wn. (2d) 589, 214 P. (2d) 204.

We shall assume for the purpose of this decision that the representation was made by appellant that the lower field contained 158 acres of plowland which could be irrigated by sprinklers. The question squarely presented, then, is whether respondents were entitled to rely upon this representation.

We are of the opinion that of the many decisions of this court cited by the parties upon this question, the case of *MacKay v. Peterson*, 122 Wash. 550, 211 Pac. 716, is most nearly in point. There, this court stated the rule in the form of a question, as follows:

"Having actually gone upon the land for the purpose of inspection, and having had every opportunity to satisfy himself as to the facts in any way he might choose, there being nothing said or done to deter him, may he now be heard to say that he relied upon the alleged misrepresentations of the seller?"

We held that he could not.

Here, respondents, Joseph John Fleischman and his brother, Ben Fleischman were men in their sixties at the time these negotiations took place, and had been born and reared on a farm in Wisconsin. For thirty years prior to the time of purchasing the Hockett ranch, they had owned and operated a farm near Winthrop, Washington. Before that they had farmed in Lewis county, and later in Douglas county. On the other hand, appellant was a mechanic by trade, and his first experience at farming was in 1949, when he bought the ranch involved in this litigation. There was no confidential or fiduciary relation existing between the parties, and they dealt with each other at arm's length. Appellant did not represent that he had made a survey of the farm, and he willingly showed respondents everything they wanted to see and pointed out the boundaries to them.

It is true that the lower field curved partially around the base of a mountain and was irregular in shape, resembling a letter L. The field was described as somewhat "rolling," and references were made to "draws," and "elevated points." But it is equally clear that the whole of the 64.1 acre field could be seen by moving around somewhat and that respondents did see all of it. There was nothing to prevent respondents from estimating the acreage in the field, and, since they were men with considerable farming experience, they were not only in a better position to do so than appellant, but, as this court stated in the *MacKay* case, *supra*, "it seems incredible

that he could have mistaken 9.86 acres for 16 acres." (Here, respondents mistook 64.1 acres for 158 acres.)

Respondents viewed the premises on two or three occasions between April 1, 1952, and April 11, 1952. Although the sale agreement was executed on April 11, 1952, the transaction was not finally completed until April 24, 1952, at which time title had been cleared, and the instruments previously placed in escrow were delivered to the respective parties and the payment of thirty thousand dollars was made to appellant. Respondents were not hurried into a quick consummation of the transaction, since they had twenty-four days in which to examine and verify the quantity of land. During the last thirteen days of this period, they were in exclusive possession of the farm.

The distinguishing factor between this case and the cases relied upon by respondents is well stated in *Sims v. Robison*, 142 Wash. 555, 253 Pac. 788, as follows:

"True, there are cases, some of which are cited on behalf of the respondents, to the effect that a vendee may rely upon representations of the vendor, as respondent Sims says he did in this case, notwithstanding some investigation by or opportunity on the part of the vendee to ascertain the truth himself. But it will be found *they are cases where the facts were peculiarly within the knowledge or means of knowledge of the vendor or his agent or for any reason the falsity of the representations were not readily ascertainable by the vendee.* But this is not that kind of a case. Here the vendee was an experienced farmer. He was buying a western Washington farm. He had a good knowledge of farming in western Washington. He examined the place. It was all open to him and its condition in all respects readily and reasonably ascertainable by him. Here the purchaser, a man of experience in the business about which he was engaged, had the ability, means and opportunity to find out the truth about the matter." (Italics ours.)

In that case, this court reversed the trial court, which had allowed a recovery for alleged fraudulent representations as to the quantity of land (among others). It was there held (under circumstances very similar to those shown by undisputed evidence in this case) that the seller had no right to rely upon the representations made to him. The

decision followed the principles laid down in the *MacKay* case, *supra*.

In the case of *Narup v. Benson*, 154 Wash. 646, 283 Pac. 179, which is closely analogous to the case at bar, this court, following the *rationale* of the *MacKay* and *Sims* cases, held that the purchaser was not entitled to rely upon the misrepresentations of the seller. There, the seller had represented that the farm contained some 105 acres of bottom land, all cultivated or capable of cultivation, when in fact the trial court found that the amount was actually 73.68 acres. Again, the experience of the purchaser and his independent investigation were determinative factors. Respondents attempt to distinguish that case because of the fact that the purchaser's stepson in that case stated, in the presence of the parties, that it did not look like the area comprised over two forties. However, the court, before mentioning this fact, had already held that the purchaser relied upon the representations at his peril. It then reiterated that the purchaser, having failed to verify the stepson's judgment on acreage, proceeded at his own risk. We do not believe that this single factor was determinative of the result reached in that case. See, also, *Marion v. Grand Coulee Dam Hotel*, 35 Wn. (2d) 589, 214 P. (2d) 204; *Corbett v. Ticktin*, 43 Wn. (2d) 248, 260 P. (2d) 895.

Respondents rely mainly upon the case of *Rackham v. Koch*, 125 Wash. 451, 216 Pac. 835, to support the judgment of the trial court. However, as stated in the *Narup* case, *supra*, this court, while allowing a recovery for misrepresentations in the *Rackham* case, *supra*, placed considerable stress upon the fact that the purchaser was inexperienced in farming. The opposite is true in this case. Furthermore, in the *Rackham* case, *supra*, the representation was that the tract contained 20 acres, whereas the survey revealed that it contained only 17 acres. As to the difference of 3 acres, this court was of the opinion that an inexperienced purchaser would not be precluded by the rule of *caveat emptor*. And we there stated that this court has not abrogated the rule of *caveat emptor* so as to relieve the purchaser of all

responsibility for a failure to observe conditions which are as much within his reach as that of the seller. This court then said:

"It is our view that, where the owner has shown his land to a prospective purchaser and has pointed out the boundaries of it, and has represented that there is a definite number of acres within those boundaries, and the acreage could be determined only by a survey, and the purchaser relies upon such representations, he is entitled to recover damages on account of any material shortage which may exist, notwithstanding he has made a detailed examination, *providing the shortage is not so glaring and palpable as to warn even the inexperienced purchaser.*" (Italics ours.)

Our conclusion is that where, as in this case, the purchaser is experienced and he has made an investigation of the premises, undeterred by the seller, and has seen all that there is to be seen, he is not entitled to rely upon the misrepresentations of the seller as to the acreage where a subsequent survey reveals that the acreage is only slightly more than one third of the amount represented by the seller. (In this case, 64.1 acres compared to 158 acres.) This discrepancy is certainly so glaring and palpable as to put an *experienced* farmer on notice.

The judgment is reversed as to cause No. 3693 (the fraud action), with directions to dismiss it with costs to appellants. As to cause No. 3787 (the foreclosure action), the judgment is reversed and remanded, with directions to enter judgment for appellant for the sum due on the note and costs, and to proceed with the foreclosure of the mortgage in the usual manner.

It is so ordered.

SCHWELLENBACH, HILL, FINLEY, and OTT, JJ., concur.

---

November 20, 1956. Petition for rehearing denied.